DARRYL HOLLAND,

        Plaintiff,

     -vs-

GLENN GOORD, in his individual capacity,
BRIAN FISCHER, in his official capacity
as Commissioner Department of
Correctional Services, ANTHONY F. ZON, in
both his individual and official capacity
as former Superintendent, Wende
Correctional Facility, THOMAS
SCHOELLKOPF, in both his individual and
official capacity as Hearing Officer,
Wende Correctional Facility, JOHN
BARBERA, in both his individual and
official capacity as Correctional
Officer, Wende Correctional Facility, JAY
WYNKOOP, in both his individual and
official capacity as Watch Commander
and/or Keeplock Review Officer, Wende
Correctional Facility, and MARTIN
KEARNEY, in both his individual and
official capacity as Captain, Wende
Correctional Facility,

        Defendants.

**CORRECTED**

**DECISION AND ORDER
No. 05-CV-6295(MAT)**

## I.  Introduction

Darryl Holland ("Holland" or "Plaintiff"), acting pro se, instituted this action pursuant to 42 U.S.C. § 1983 against Defendants alleging violations of his rights under the First Amendment's Free Exercise Clause, the Due Process Clause, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Presently pending are Defendants' motion for summary judgment and Plaintiff's cross-motion for summary judgment. For the reasons

discussed below, Defendants' motion is granted, and Plaintiff's cross-motion is denied.[1]

## II. Factual Background

On November 20, 2003, at about 2 p.m., Captain Martin Kearney ("Capt. Kearney") of Wende Correctional Facility ("Wende") received a tip from a confidential informant that Holland had been using drugs. (Kearney 50-53).[2] Capt. Kearney advised Correction Officer John Barbera ("CO Barbera"), who is certified to conduct urine testing, to obtain a specimen from Holland as soon as possible and submit it for testing. (Kearney 52-54, 66-67, 84; Barbera 5, 50-51).

DOCCS' urine testing procedure is set forth in Directive #4937. (Kearney 37-40; Barbera 33); see also N.Y. COMP. CODE R. & REGS. tit. 7, § 1020.4 ("Urinalysis Testing-Procedure"). If an inmate is unable to produce a urine sample at the time of the original request, he is offered water and given three hours in which to comply. (Barbera 31-32). If, after three hours, the inmate has not produced a urine sample, he is deemed to have refused the test. (Barbera 31-32). In such case, the inmate could incur the same disciplinary disposition that a positive result could have

---

[1] As filed on June 17, 2013, on pages 1-2, the Decision and Order inadvertently stated:

> For the reasons discussed below, Defendants' motion is denied in part and granted in part, and Plaintiff's cross-motion is granted in part and denied in part.

This Decision and Order now correctly states:

> For the reasons discussed below, Defendants' motion is granted, and Plaintiff's cross-motion is denied.

[2] References to pages from the parties' deposition transcripts are in parentheses and are given in the following form: "([Party's Name] [Page Number(s)])".

supported. S̲E̲E̲ N.Y. C̲O̲M̲P̲. C̲O̲D̲E̲ R. & R̲E̲G̲S̲. tit. 7, § 1020.4(d)(4). Directive #4937 does not state that a correction officer has the discretion to delay the testing beyond three hours. S̲e̲e̲ i̲d̲.̲

CO Barbera's regular shift was 7 a.m. to 3 p.m., but Capt. Kearney authorized overtime in order to have CO Barbera complete Holland's test. (Kearney 52; Barbera 73). There was no one on the shift following CO Barbera's authorized to conduct urine testing. (Barbera 75).

When CO Barbera brought Holland to the urine testing room at 2:10 p.m. and asked him to provide a sample, Holland replied that he was unable to do so because he had not eaten or drunk anything since 4:30 a.m., due to his fasting for Ramadan. (Holland 31-37). Holland offered to drink water after sunset and then provide a urine sample within a reasonable time afterwards. Holland also asked CO Barbera to contact Wende's Islamic Chaplain for confirmation of Holland's fasting requirements during Ramadan. CO Barbera stated he was without authority to postpone the test, and declined to contact the facility's imam.

At about 4:15 p.m., CO Barbera offered Holland some water. Holland refused, saying, "I can't drink no water. I'm fasting." (Holland 37). CO Barbera said, "I'll have to lock you up." (I̲d̲.̲). Holland replied, "[Y]ou've got to do what you've got to do." (I̲d̲.̲).

At 5:15 p.m., CO Barbera informed Holland that the time to provide a sample had passed, that he was deemed to have refused a direct order the test, and that he would be written up in a misbehavior report. (Barbera 73). Upon learning of the incident

from CO Barbera's misbehavior report, Capt. Kearney did not exercise the discretion he had used in other cases to grant an exception to the policy outlined in Directive #4937. (Kearney 62-63).

Hearing Officer Thomas Schoellkopf ("HO Schoellkopf") conducted a Tier III Superintendent's Hearing on November 25, 2003, regarding the misbehavior report. See Plaintiff's Exhibit ("Pl's Ex.") 10 (Dkt #78-5). The hearing lasted five minutes, and HO Schoellkopf declined to call Plaintiff's sole requested witness-Imam Aleem Hassan ("Imam Hassan"), the facility's Islamic chaplain. HO Schoellkopf found Plaintiff "not guilty" of violating Rule 106.10 (refusing a direct order) and "guilty" of violating Rule 180.14 (urinalysis testing violation). Pl's Ex. 10 (Dkt #78-5). The penalty imposed was 90 days of keeplock, as well as 90 days of lost privileges (package, commissary, phone, and T.V.). Id. Plaintiff instituted a timely administrative appeal.

On December 4, 2003, Wende's Islamic Chaplain, Imam Hassan, sent a memorandum to Capt. Kearney, describing Holland's circumstances and explaining that during Ramadan, "a fasting person is not allowed to eat or drink during the daylight hours." He noted, "It seems that the urine sample could have been taken after sunset when the inmate would have eaten and drank [sic] at that time."

On December 9, 2003, filed a grievance with the Inmate Grievance Resolution Committee ("IGRC") requesting that a "memo be drawn up so that this does not happen to other Muslims during

Ramadan . . . where they might be forced to have to drink water during fasting times or suffer disciplinary actions." The IGRC responded by "recommend[ing] that [the Imam] take the necessary steps to ensure that Muslims who are fasting do not have to break there [sic] fast to provide urine samples in the future during the month of Ramdan." Holland, who was still in keeplock, stated that although he agreed with the IGRC's conclusion, he nevertheless was appealing it to Superintendent Anthony Zon ("Supt. Zon").

On January 21, 2004, Supt. Zon issued the following decision:

> Upon further investigation and the IGRC hearing, this grievance is accepted in part. Per the Imam, Muslims are not allowed to eat or drink during daylight hours—sunrise to sunset during Ramadan. Urinalysis testing could be taken after sunset, for example, after the grievant has broken his fast. Any future concerns can be addressed to the Imam.

Pl's Ex. 12 (Dkt #78-5). Holland indicated that while he agreed with Supt. Zon's conclusion, he was compelled to appeal it because the adverse disciplinary hearing upon which the grievance was based had not been reversed. Thomas Eagen, Director of the Inmate Grievance Program Central Office Review Committee ("IGP/CORC") issued a decision on March 3, 2004, stating that Plaintiff's request was "unanimously accepted in part . . . to the extent that CORC upholds the determination of the Superintendent for the reasons stated." Pl's Ex. 14 (Dkt #78-5).

On February 5, 2004, Plaintiff's adverse disciplinary ruling was reviewed and reversed by Donald Selsky, Director of Special Housing/Inmate Disciplinary Program. The reason given for the reversal was "failure to interview requested employee witness who

could have provided relevant testimony." Pl's Ex. 15 (Dkt #78-5).

All references to the November 25, 2003 Superintendent's Hearing were expunged from Plaintiff's records. <u>Id.</u> Plaintiff was released from keeplock after having served 77 days of his 90-day sentence.

## III. **Procedural History of Plaintiff's § 1983 Action**

Plaintiff timely commenced the instant action <u>pro se</u>. The Court (Siragusa, D.J.) assigned <u>pro bono</u> counsel on December 13, 2007. Extensive discovery ensued, including the depositions of Holland, CO Barbera, Capt. Kearney, Supt. Zon, Imam Hassan, and HO Schoellkopf.

Defendants filed a motion for summary judgment on June 15, 2010 (Dkt ##70-75). In support of their defense to Plaintiff's claims under the Free Exercise Clause and RLUIPA, Defendants submitted the declarations of two DOCCS employees, Lester Wright, M.D. ("Dr. Wright") and Captain Stephen Casaceli ("Capt. Casaceli"). Plaintiff filed a motion (Dkt #77) on July 23, 2010, to have Dr. Wright's Declaration and Capt. Casaceli's Declaration stricken because Defendants never identified Dr. Wright or Capt. Casaceli in their disclosures pursuant to Rule 26 of the Federal Rules of Civil Procedure ("F.R.C.P.") and never supplemented their Rule 26 disclosures to add Dr. Wright or Capt. Casaceli as potential witnesses. Plaintiff also cross-moved for summary judgment (Dkt #78) against Defendants. In support of their summary judgment motion, Plaintiff submitted an affidavit from their expert witness on the Muslim religion, Dr. Mohammed Shafiq. Pl's Ex. 22 (Dkt. #78-5).

On October 8, 2010, the Court (Siragusa, D.J./Payson, M.J.) denied Defendants' motion to amend their answer to include a statute of limitations defense to Plaintiff's RLUIPA claim, finding that Defendants had not acted with the requisite diligence during the 20 months they had failed to assert the defense and had not demonstrated good cause. (Dkt #87).

This matter was transferred to the undersigned on October 19, 2012. (Dkt #88). On December 20, 2012, the Court granted (Dkt #89) Plaintiff's motion to strike the declarations of Dr. Wright and Captain Casaceli, and held that these pleadings would not be considered in connection with Defendants' motion for summary judgment, in any other pending motion, or at trial.

The summary judgment motions are now fully submitted and ready for decision.

## IV. Summary Judgment Standards Under F.R.C.P. 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see generally, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Celotex Corp., 477 U.S. at 324.

If the movant meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue

as to any material fact actually does exist. Id. at 331; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing 10A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93-95 (1983)).

The nonmoving party must produce "significant probative evidence" demonstrating that a material factual dispute does in fact exist; otherwise, summary judgment is appropriate. Anderson, 477 U.S. at 249 (citation omitted). In order to establish a material issue of fact, the nonmovant need only provide "sufficient evidence supporting the claimed factual dispute" such that a "jury or judge [is required] to resolve the parties' differing versions of the truth at trial." Id. at 248-49 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U .S. at 587 (quoting FED. R. CIV. P. 56(e) advisory committee's note on 1963 amendments).

## V. Discussion

### A. Denial of Due Process at Plaintiff's Disciplinary Hearing

#### 1. Background

Holland contends that he was deprived of his constitutional right to due process by HO Schoellkopf's denial of his request to

call Imam Hassan as a witness at the hearing. Holland's defense was that he was "not able to go to the bathroom due to [his] not being able to drink any water." H.3.[3] HO Schoellkopf noted that he did not "really see how the Imam can . . . be a relevant witness" on that topic. Id. (ellipsis in original). Holland replied that the imam could verify that he was fasting for Ramadan, that he could not drink the water offered by CO Barbera because to do so would violate his religious beliefs. H.3-4. HO Schoellkopf ultimately denied the request, stating that he did not see the need for the imam to testify unless he was "present for the incident", and noting that it was "redundant" given that Holland had explained what his defense was. H.4. As noted above, HO Schoellkopf's decision was reversed on the basis that he failed to call the imam, who had relevant testimony to offer, as a witness.

### 2. The Applicable Law

To award damages under 42 U.S.C. § 1983 for an alleged violation of procedural due process, the reviewing court must find that, as the result of conduct performed under color of state law, the inmate was deprived of life, liberty, or property without due process of law. Bedoya v. Coughlin, 91 F.3d 349, 351 (2d Cir. 1996). It is undisputed that HO Schoellkopf acted under color of state law. The remaining inquiry comprises two prongs: (1) whether Holland had a protected liberty interest in not being confined in keeplock for 77 days under the actual circumstances of his

3

Citations to "H.__" refer to pages from the disciplinary hearing transcript, attached as Pl's Ex. 10 (Dkt #78-5).

confinement; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law. Id. at 351-52 (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460-61 (1989)).

Defendants argues that they are entitled to summary judgment because Plaintiff cannot establish a protected liberty interest in being free from his 77-day keeplock confinement. Defendants also contend that HO Schoellkopf's denial of the request to call Imam Hassan did not violate due process because his testimony would have been cumulative to that offered by Holland.

### 3. Existence of a Protectible Liberty Interest

A plaintiff-inmate must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation; and (2) that the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484-84 (1995); see also Tellier v. Fields, 260 F.3d 69, 80 (2d Cir. 2000). Courts in this Circuit have held that "it is now firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement, thus satisfying the first Sandin factor." Ciaprazi v. Goord, No. Civ.9:02CV00915(GLS), 2005 WL 3531464, at *11 (N.D.N.Y. Dec. 22, 2005) (citing Palmer v. Richards, 364 F.3d 60, 64 n. 2 (2d Cir. 2004); other citations omitted)).

The Court accordingly turns the Sandin atypicality analysis, which requires consideration of "'the extent to which the

conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (quoting Wright v. Coughlin, 132 F.3d 133, 136 (2d Cir. 1998)). The conditions of confinement must be considered "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." Welch v. Bartlett, 196 F.3d 389, 393 (2d Cir. 1999). Where, as here the facts as to conditions and duration are undisputed, is appropriate to decide the Sandin issue as a matter of law. Colon v. Howard, 215 F.3d 227, 230-31 (2d Cir. 2000) (citing Sealey v. Giltner, 197 F.3d 578, 585 (2d Cir. 1999)).

Defendants assert that the 77 days Plaintiff "spent in keeplock, under normal keeplock conditions, was not a significant hardship." Defendants have not submitted a description of what constitutes "normal" keeplock conditions, but the applicable regulations define keeplock to include restriction to one's prison room or cell. See N.Y. COMP. CODE R. & REGS. tit. 7, § 251-2.2. A keeplocked inmate also is "deprived of participation in normal prison routine," Gittens v. LeFevre, 891 F.2d 38, 39 (2d Cir. 1989) (citing N.Y. COMP. CODES R. & REGS. tit. 7, § 251-1.6)), denied contact with other inmates, id., denied "telephone and commissary privileges." Wright v. Coughlin, 132 F.3d 133, 135 (2d Cir. 1998). The case law in this Circuit reflects that a New York State

prisoner in keeplock has the same visitation rights as other inmates, may retain his personal property, has access to books and periodicals from the library, and is afforded one hour of exercise each day. Gayle v. Keane, No. 94 Civ. 7583(JSM), 1998 WL 187862, at *5 (S.D.N.Y. Apr. 21, 1998) (citation to record omitted). Thus, keeplock confinement differs from normal confinement in two significant ways: the inmate is (1) physically isolated from the rest of the population and (2) misses the opportunity to participate in programs. Id.

District court decisions in this Circuit post-Sandin appear "unanimous that keeplock confinements of sixty days or less in New York prisons are not [an] 'atypical hardship.'" Torres v. Mazzuca, 246 F. Supp.2d 334, 341 (S.D.N.Y. 2003) (citing Frazier, 81 F.3d at 317-18 (neither 12-day confinement in SHU nor 11-day confinement in Close Supervision Unit was the kind of atypical, significant deprivation in which New York might conceivably create a liberty interest); Duncan v. Keane, No. 93 Civ. 6026, 1996 WL 511573, at *2 (S.D.N.Y. Aug. 22, 1996) (58 days in keeplock); Camacho v. Keane, No. 95 Civ. 0182, 1996 WL 204483, at *2 (S.D.N.Y. Apr. 25, 1996) (40 days in keeplock); other citations omitted)).

Holland avers that in addition to the "normal" incidents of keeplock, he also sustained the following hardships he describes as "atypical": denial of permission to participate in the important Eid ul-Fitr celebration marking the end of Ramadan; and the denial of permission to attend congregational prayers, including the Friday congregational worship. See, e.g., Declaration of Darryl

-12-

Holland, ¶¶ 15, 31, 33. Plaintiff also asserts that he received "punishment trays" that included smaller portion sizes of food (one-third to one-half less than normal), which caused him to lose 25 to 30 pounds, suffer "gastric distress", and be constantly hungry. See id.

The denial of packages, commissary, telephone and television privileges and smaller food portions are "normal" incidents of keeplock. Courts in this Circuit have found that keeplock's differences from normal confinement—without more—do not amount to an atypical and significant hardship. E.g., Mack v. Artuz, No. 01Civ.11832JSRGWG, 2002 WL 31845087, at *8 (S.D.N.Y. Dec. 19, 2002) ("Mack has not alleged how keeplock differs from normal confinement. Thus, there is no factual predicate from which it could be concluded that his confinement was 'atypical and significant.'") (internal citation omitted), report and recommendation adopted, (S.D.N.Y. Mar. 4, 2003).

With regard to the denial of permission to attend the El Eid Fitr religious feast and weekly congregational prayers,[4] at least one district court in this Circuit has concluded that similar deprivations do not amount to a dramatic departure from the basic conditions of the prisoner's sentence. See Wilson v. Kelly, No. 9:11-cv-00030 (MAD/RFT), 2012 WL 3705007, at *9-*10 (N.D.N.Y.

_____

[4] The Second Circuit has "found it well established that a prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock." Ford, at (citing Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993)(citing Young v. Coughlin, 866 F.2d 567, 570 (2d Cir.), cert. denied, 492 U.S. 909 (1989); internal citation omitted). However, Plaintiff has not asserted a claim under the Free Exercise clause in connection with the denial of the opportunity to attend the El Eid Fitr feast and weekly congregate services.

June 22, 2012) (finding that plaintiff's inability to attend seven Muslim religious services, loss of his honor block cell status and loss of wages, which all occurred because he was held in keeplock for 45 days, did not constitute deprivation of a liberty interest) (citing <u>Farmer v. Hawk</u>, No. 94-CV-2274(GK), 1996 WL 525321, at *6 (D. D.C. Sept. 5, 1996) ("Although Plaintiff alleges that her placement in controlled housing led to fewer privileges, less time outdoors, restrictions on recreational activities, and denial of access to religious services, educational programs and vocational programs, these deprivations are not so 'atypical' or 'significant . . . in relation to the ordinary incidents of prison life' that they constitute deprivations of a liberty interest.")), <u>report</u> <u>and recommendation</u> <u>adopted</u> <u>in</u> <u>relevant</u> <u>part</u>, 2012 WL 3704996 (N.D.N.Y. Aug. 27, 2012).

### 4. Denial of Due Process at the Hearing

Because the Court has found that Holland did not have a protectible liberty interest in being free from his 77-day term of keeplock, the Court need not consider whether Holland was denied his right to procedural due process at the disciplinary hearing. <u>See</u>, <u>e.g.</u>, <u>Bedoya v. Coughlin</u>, 91 F.3d at 351 (describing the two-pronged inquiry to be used in evaluating claims that a plaintiff was denied procedural due process at a disciplinary hearing).

### B. Plaintiff's First Amendment Claim and RLUIPA Claim

Holland's religious-liberty claims derive from two different sources: the Free Exercise Clause of the First Amendment, and § 3 of RLUIPA, 42 U.S.C. § 2000cc-1. The First Amendment's Free

Exercise Clause, applicable to the States through the Fourteenth Amendment, see Cantwell v. State of Connecticut, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. " U.S. CONST., amend. I. In the prison context, the Free Exercise Clause is subject to some limitation, given both "the fact of incarceration and . . . valid penological objectives-including deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987).

Enacted in 2000, with the intention of providing greater protection to prisoners from burdens imposed by the government of their religions, RLUIPA prohibits governmental imposition of a "substantial burden on the religious exercise" of an inmate, unless defendants can show that the burden is: (1) in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1(a); see also Washington v. Klem, 497 F.3d 272, 276-66 (3d Cir. 2007). Compared to RLUIPA, the First Amendment is "less generous" to prisoners, since "a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy 'is reasonably related to legitimate penological interests.'" Redd v. Wright, 597 F.3d 523, 536 (2d Cir. 2010) (quoting O'Lone, 482 U.S. at 349 (internal quotation marks omitted in Redd).

### 1.   Immunity to Monetary Damages Under RLUIPA

The Supreme Court recently interpreted the "appropriate relief" language in RLUIPA, 42 U.S.C. § 2000cc-2(a), in Sossamon v. Texas, ___ U.S. ____, 131 S. Ct. 1651, 179 L. Ed.2d 700 (2011), and held that by accepting federal funds, states do not consent to waive their immunity to suits for monetary damages under RLUIPA. RLUIPA's express private cause of action "is not the unequivocal expression of state consent that [the Supreme Court's] precedents require." Sossamon, 131 S. Ct. at 1658. The Supreme Court explained that "appropriate relief" does not clearly include money damages; rather, the word "appropriate" "is inherently context-dependent." Id. at 1659 (citations omitted). According to the Sossamon Court, "[t]he context [under RLUIPA]—where the defendant is a sovereign—suggests, if anything, that  monetary damages are not 'suitable' or 'proper.'" Id. (citing Federal Mar. Comm'n v. S.C., State Ports Auth., 535 U.S. 743, 765 (2002)). In light of Sossamon, Holland's claims for monetary damages under RLUIPA against Defendants in their individual capacities must be dismissed.

### 2.   Qualified Immunity

Defendants assert that they are entitled to qualified immunity with respect to Holland's claims for monetary damages arising under RLUIPA and the Free Exercise Clause. Qualified immunity is "an immunity from suit rather than a mere defense to liability." Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (quotation and emphasis omitted), overruled on other grounds by Pearson v. Callahan, ___ U.S. ____, 129 S. Ct. 808, 172 L. Ed.2d 565 (2009).

It shields government officials from liability for civil damages to they extent that performance of their discretionary duties does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). In order to be clearly established,

> "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

<u>Saucier</u>, 533 U.S. at 202 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)). An official cannot be held personally liable for taking action that he or she reasonably, but mistakenly, believes is lawful. <u>See</u> <u>Anderson</u>, 483 U.S. at 641 (discussing reasonable but mistaken determinations of probable cause).

"The task of framing the right at issue with some precision is critical in determining whether that particular right was clearly established at the time of the defendants' alleged violation." <u>Redd</u>, 597 F.3d at 536. the Supreme Court has expressly warned against framing the constitutional right at issue "at too broad a level of generality." <u>Redd</u>, 597 F.3d at 536 (citation omitted), and the Second Circuit has "interposed a 'reasonable specificity' requirement on defining the contours of a constitutional right for qualified immunity purposes." <u>Id.</u> (citation omitted)).

Holland does not assert that directing him to submit to a urinalysis test during Ramadan, in and of itself, infringes upon his sincerely held beliefs. Instead, Holland claims that the right

at issue here should be characterized as the "right to fast during Ramadan in November 2003, without being punished." Plaintiff's Memorandum of Law ("Pl's Mem.") at 24 (Dkt #78-7). Holland, however, has not alleged, nor can he do so on this record, that his Ramadan fast in 2003 was interrupted or infringed upon at any other time apart from the incident involving the November 20th urine test. Holland's characterization of his right is not "reasonably specific" because it fails to account for Directive #4937 in particular.

A comparison with Redd v. Wright is instructive. In Redd, the plaintiff-inmate brought a § 1983 action against DOCCS employees alleging violations of the First Amendment and RLUIPA arising out of his placement in confinement under a tuberculosis ("TB") hold policy. Under the relevant policy in Redd, if an inmate refused the TB test, the inmate first was counseled about its importance, and then, if he still refused the test, he was placed in "TB hold", which amounted to "keeplock status" in his cell. 597 F.3d at 533. Redd was placed in TB hold after he refused to undergo a TB test on religious grounds. Id. at 534.

Redd asserted that his free exercise rights and rights under RLUIPA were violated by requiring him to submit to a TB test over his religious objection. For purposes of defeating the defendants' assertion of qualified immunity, he claimed that the right at issue should be characterized as the right "not to be subjected to punishment or more burdensome confinement as a consequence of his religious beliefs," Redd, 597 F.3d at 536 (quotation to record

-18-

omitted). The Second Circuit disagreed, concluding that the right at issue was Redd's right under the First Amendment and RLUIPA to a religious exemption from the TB testing policy. Id.

In light of Redd's teachings, the Court finds that Holland has drawn the contours of the pertinent right too broadly. The right at issue here should be framed as the right under the First Amendment and RLUIPA to a religious exemption from Directive #4937 during Ramadan and other times during which Muslims have religious fasting obligations. See Redd, 597 F.3d at 536. Having found that the right at issue here is Holland's right under the First Amendment and RLUIPA to a religious exemption from Directive #4937, the Court turns to a consideration of whether that right was "clearly established" at the time relevant to this lawsuit.

In November 2003, when Holland was deemed to have refused to comply with CO Barbera's direction to provide a urine sample, it had not been clearly established by either the Supreme Court or the Second Circuit that Directive #4937, or a substantially equivalent policy, was not reasonably related to a legitimate penological interest or was not the least restrictive means of furthering a compelling governmental interest. Moreover, it had not been clearly established by either the Supreme Court or the Second Circuit that Directive #4937, or a substantially equivalent policy, placed a substantial burden on an inmate's religious liberty. Because Holland framed the right at issue in too broad a fashion, the prisoners' rights cases he cites in support of his qualified immunity argument are inapposite. See Plaintiff's Memorandum of Law

at 24 (citations omitted) (Dtk #78-7). Finally, Holland has not directed the Court to any relevant case law declaring Directive #4937 invalid under either the First Amendment or RLUIPA (or, for that matter, RLUIPA's predecessor, the Religious Freedom and Restoration Act ("RFRA")).

"A right may be clearly established, even in the absence of directly applicable Supreme Court or circuit case law, if this case law has foreshadowed a particular ruling on the issue," Redd, 597 F.3d at 537 (citing Tellier v. Fields, 280 F.3d 69, 84 (2d Cir. 2000)). Plaintiff has pointed to no applicable case law that "clearly foreshadowed" a holding by the Second Circuit that Directive #4937, as applied in his case, violated his free exercise rights under RLUIPA's compelling interest standard, much less under the First Amendment's reasonableness test. See Redd, 597 F.3d at 537-38.

Accordingly, the Court finds that Holland's claims for monetary damages stemming from the alleged violation of his Free Exercise rights against the individual defendants are barred by qualified immunity. Qualified immunity provides an alternative basis for dismissing Holland's claims for monetary damages against the individual defendants under RLUIPA.

### 3. First Amendment Claims: Prospective Injunctive Relief

"Qualified immunity shields the defendants only from claims for monetary damages and does not bar actions for declaratory or injunctive relief." Adler v. Pataki, 185 F.3d 35, 48 (2d Cir. 1999)

(citing <u>Wood v. Strickland</u>, 420 U.S. 308, 315 n. 6 (1975) ("[I]mmunity from damages does not ordinarily bar equitable relief as well."), <u>overruled in part on other grounds by Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982)). In his Second Amended Complaint, Holland seeks injunctive relief granting him and other practicing Muslims an exemption from Directive #4937's three-hour time limit during Ramadan and other periods of religious fasting. If Holland ultimately succeeds on the merits of his First Amendment claim, the Court may "fashion equitable remedies . . . . based on its assessment of the equities . . . ." <u>Adler</u>, 185 F.3d at 48. Accordingly, the Court proceeds to consider whether Holland has raised material issues of fact in regards to his claim that his rights under the First Amendment's Free Exercise Clause were violated.

### a.    Overview

The analysis of Holland's Free Exercise claims proceeds under the framework, set forth by the Supreme Court in <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. at 349. In <u>O'Lone</u>, the Supreme Court held that a challenged prison regulation is judged "under a 'reasonableness' test less restrictive than that ordinarily applied" to Free Exercise claims. <u>Id.</u> at 349. A regulation that burdens a prisoner's protected right passes constitutional muster "'if it is reasonably related to legitimate penological interests.'" <u>Id.</u> (quoting <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)). <u>See</u> <u>also</u>, <u>e.g.</u>, <u>Salahuddin v. Goord</u>, 467 F.3d 263, 274 (2d Cir. 2006).

As an initial matter, Defendants argue that Plaintiff cannot demonstrate that Directive #4937 caused the injuries about which he complains, because there could have been another reason for his failure to produce a urine sample and suffer the consequence of a misbehavior report. Defendants suggest that Plaintiff intentionally did not urinate in order to shield himself from an incriminating test result, or that he may have had a medical problem which prevented him from urinating. Plaintiff counters by pointing out that CO Barbera testified that he "did not disbelieve" that Holland truly was unable to produce a urine specimen, and HO Schoellkopf also found Holland "not guilty" of the charge of disobeying CO Barbera's direct order to produce a urine sample.

The Court agrees that there may be an issue as to causation in this case. See Miner v. City of Glens Fallls, 999 F.2d 655, 660 (2d Cir. 1993) ("[T]he burden of proving causation [in plaintiff's § 1983 action] never shifted to the defendants.") (citing, inter alia, Carey v. Piphus, 435 U.S. 247, 257-58 (1978) (noting that although 42 U.S.C. § 1983 does not expressly mention causation as an element, damages under the statute are compensable only if caused by the deprivation of a constitutional right)). Holland's case is sui generis. In Ford, for example, the causative link between the challenged conduct and the substantial burden on sincere religious beliefs was obvious: DOCCS' officials denied Ford attendance at an important religious feast—hence, the substantial burden on his sincerely held beliefs. Likewise, in Redd v. Wright, supra, and Jolly v. Coughlin, supra, the prison policy at issue

-22-

directly compelled a prisoner to act in a way that violated his religious precepts or face discipline or other adverse consequences. In <u>Redd</u> and <u>Jolly</u>, the latent tuberculosis testing policy required an inmate to submit to a skin-test or be confined to medical keeplock. Directive #4937's requirement of providing a urine sample within three hours of a direct order, in and of itself, does not substantially burden Holland's ability to fast uninterruptedly. Moreover, there are situations where the three-hour time-limit would not be problematic for an inmate in Holland's situation, such as when the request for a urine sample was made closer in time to sundown. With these concerns in mind, the Court proceeds to consider whether Holland has made out a <u>prima facie</u> Free Exercise claim.

### b. Substantial Burden on a Sincerely Held Religious Belief

The Second Circuit has stated that as a threshold issue,[5] a inmate must show that the disputed policy "substantially burdens his sincerely held religious beliefs." <u>Salahuddin</u>, 467 F.3d at 274-75 (citing <u>Ford v. McGinnis</u>, 352 F.3d 582, 591 (2d Cir. 2003)). With regard to whether the religious belief is covered under the Free Exercise Clause, the Second Circuit has noted that the

---

[5]

The Second Circuit has noted that, following the invalidation of RFRA, its sister circuits are now "apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims." <u>Ford</u>, 352 F.3d at 592 (comparing <u>Williams v. Morton</u>, 343 F.3d 212, 217 (3d Cir. 2003) (finding "no support for" defendants' argument that it is "a prerequisite for the inmate to establish that the challenged prison policy 'substantially burdens' his or her religious beliefs"), <u>with</u> <u>Levitan v. Ashcroft</u>, 281 F.3d 1313, 1320-21 (D.C. Cir. 2002) (requiring prisoners demonstrate that free exercise of religion substantially burdened)). The <u>Ford</u> panel held that since the plaintiff had not disputed the application of the "substantial burden" requirement, it would proceed as if the requirement applied. <u>Id.</u>; <u>see also</u> <u>Salahuddin</u>, 467 F.3d at 274-75 & n.5 (similar). Holland and Defendants have assumed that the "substantial burden" test applies, and this Court will do the same. <u>See</u> <u>Ford</u>, <u>supra</u>; <u>Salahuddin</u>, <u>supra</u>.

judiciary's "competence properly extends to determining 'whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious.'" Patrick v. LeFevre, 745 F.2d 153, 157 (2d Cir. 1984). (quotation omitted); alteration in Patrick) Defendants do not dispute that Holland is a practicing Muslim and has a sincere belief in his religion. Defendants likewise do not dispute that the Ramadan time of fasting, as a whole, is a central or important aspect of Holland's Islamic faith. Essentially, Defendants argue that Plaintiff's fasting obligations were not substantially burdened by the request to drink a small amount of water so as to supply a urine sample. Defendants cite to Imam Hassan's and Plaintiff's deposition testimony in support of this argument.

At his deposition, Imam Hassan testified that Holland's case was the first of its kind that he can recall. (Hassan 53). The imam commented that when the correction officers are conducting random tests, they "normally leave the Ramadan guys alone," which led him to believe that Holland was suspected of using drugs. (Id.) The imam noted that Ramadan does not forbid urine testing and explained,

> If [Holland] broke the fast because of something beyond his control, like in this case he's being ordered [to produce a urine sample], the consequence [of not drinking water] would be getting locked up for 90 days or whatever, which do you choose. So he could have choose [sic] to drink the water, make up one day. He wouldn't have to make up those other days. He wouldn't have to fast 60 days because there were circumstances beyond his control. He was being compelled by, you know, the authorities. You know, in his position as an inmate, he could have drank the water and made up the one day.

(Hassan 42-43). Imam Hassan testified that although it would have been preferable to have allowed Holland to wait until after breaking his fast to provide a urine sample, "[t]here is an always an exception" in Islam. (Hassan 113).

Plaintiff has submitted the affidavit of Dr. Mohammed Shariq for purposes of demonstrating that his religious beliefs were substantially burdened. Dr. Shariq avers that "Holland would have committed a grave sin by not fulfilling the obligation of his faith to which he was committed if he had consumed water while fasting." Affidavit of Dr. Mohammed Shariq ("Shariq Aff."), ¶ 17, Pl's Ex. 22. According to Dr. Shariq, "[t]here is no recognized exception in the Islamic faith that would have permitted Holland to drink the water." Id. However, the burden on the religious practice is to be measured by an individual's specific beliefs, not general ecclesiastical doctrine. See Ford v. McGinnis, 352 F.3d at 594 ("By looking behind Ford's sincerely held belief, the district court impermissibly confronted what is, in essence, the 'ecclesiastical question' of whether, under Islam, the postponed meal retained religious meaning.") (citing Hernandez v. Commissioner of Internal Revenue, 490 U.S. 680, 699 (1989)). Plaintiff himself testified as follows:

> Q. By "consequences", you're talking about religious consequences [of drinking water]?
> A. Yes, sir, the religious consequences.
> Q. And you've testified that you knew what the consequences were for one extra day of fasting; is that right?
> A. Yes.
> Q. And at the time that you were giving the urine sample or not able to give the urine sample, your

```
                    understanding of the consequences were one extra
                    day of fasting; is that right?
          A.        Yes, that's what I believed it to be, yes.
```

(Holland 75:14-25).

The Second Circuit has noted that not every possible restriction on religious practices is a violation, and "[t]here may be inconveniences so trivial that they are most properly ignored." McEachin v. McGinnis 357 F.3d 197, 203 n.6 (2d Cir. 2004). In this respect, the Second Circuit noted, the arena of Free Exercise law "is no different from many others in which the time-honored maxim 'de minimis non curat lex'[6] applies." Id. "De minimis burdens on the free exercise of religion are not of constitutional dimension." Rapier v. Harris, 172 F.3d 999, 1006 n. 4 (7th Cir. 1999). Here, even assuming that Holland would have been burdened by one extra day of fasting, such a burden cannot be characterized as substantial. See Rapier, 172 F.3d at 1006 n. 4 (holding that unavailability of pork-free meals on three out of 810 occasions constituted only a de minimis burden on Muslim prisoner's religion) (cited with approval in Ford, 352 F.3d at 594 n.12); Young v. Bass, 1-C-7944, 2004 WL 765874, at *2 (N.D. Ill. Apr. 7, 2004) ("It is also undisputed that Plaintiff, during the 2001 Ramadan, only was prevented from properly fasting for two days."). Significantly, Holland has not produced any affidavits, depositions, answers to interrogatories, or admissions alleging that Defendants routinely

---

      6

          This phrase translates as "the law does not concern itself with trifles." Gottlieb Dev. LLC v. Paramount Pictures Corp., 590 F. Supp.2d 625, 632 (S.D.N.Y. 2008); see also Montemarano v. New York City Dept. of Corr., 31 Misc.3d 1232(A), 930 N.Y.S.2d 175, 2011 WL 2089661, at *3 n.3 (N.Y. Sup. May 27, 2011) (discussing etymology of the phrase)).

prevented him from properly fasting. The Court accordingly concludes that being requested to drink a small amount of water for purposes of complying with Directive #4937's three-hour time limit was a de minimis burden on Holland's free exercise of his religion and fails to state a colorable constitutional claim. See Young v. Bass, supra, (finding it significant that plaintiff-inmate had not adduced evidence alleging prison officials "routinely prevented him from properly fasting by serving his meals at the wrong time during Ramadan"; holding that being prevented from properly fasting for two days was a de minimis burden on plaintiff's free exercise of his religion and did not "rise to a constitutional dimension") (internal and other citation omitted).

### c.    Reasonably Related to a Legitimate Penological Interest

Once a plaintiff makes a threshold showing of a substantial burden, the reviewing court proceeds to evaluate the reasonableness of the challenged regulation in light of the four Turner v. Safley factors. Salahuddin, 467 F.3d at 274 (citing Turner, 482 U.S. at 90-91; footnote omitted). The defendants' "relatively limited burden" is to identify the legitimate penological interests justifying the infringing conduct. Id. at 275. Because the Court has not found any genuine issues of material fact regarding the substantial burden element, the Court need not address the Turner factors.

**4. RLUIPA – Claims For Prospective Injunctive Relief Against Defendants In Their Official Capacities**

Although Plaintiff's claims for monetary and punitive damages brought pursuant to RLUIPA must be dismissed under <u>Sossamon</u>, Plaintiff has requested both declaratory and injunctive relief, this finding does not totally moot his claims. <u>E.g.</u>, <u>Pilgrim v. Artus</u>, Civ. No. 9:07-CV-1001 (GLS/RFT), 2010 WL 3724883, at *16-17 (N.D.N.Y. Mar. 18, 2010). The Court accordingly proceeds to consider whether Plaintiff has raised genuine issues of material fact with regard to his claim under RLUIPA.

After the Supreme Court invalidated RFRA as an excessive use of legislative authority, Congress passed RLUIPA, 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2), in order "to grant heightened protection to prisoners from burdens imposed by the government." <u>Washington v. Klem</u>, 497 F.3d 272, 276 (3d Cir. 2007). RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc-5(7), whereas traditional First Amendment jurisprudence protects only "the observation of [] central religious belief[s] or practice[s]." <u>Civil Liberties for Urban Believers</u>, 342 F.3d 752, 760 (7th Cir. 2003) (citing, <u>inter alia</u>, <u>Hernandez v. Commissioner</u>, 490 U.S. 680, 699 (1989)).

RLUIPA provides, in relevant part, that the government shall not impose a "substantial burden" upon an institutionalized person's religious exercise unless the government demonstrates that

burden imposed is in furtherance of a "compelling interest" and is the "least restrictive means" of furthering that interest. 42 U.S.C. § 2000cc-1(a). Here, as discussed above, the Court has determined that Plaintiff has failed to make out a <u>prima facie</u> case under the Free Exercise Clause. Therefore, Plaintiff's RLUIPA claim necessarily must fail. <u>See</u> <u>Marria v. Broaddus</u>, 200 F. Supp.2d 280, 297 (S.D.N.Y. 2002) (citing 2 U.S.C. § 2000cc-2(b)) ("Under RLUIPA, once a plaintiff produces <u>prima facie</u> evidence to support a free exercise violation, the plaintiff bears the burden of persuasion on whether the regulation substantially burdens the plaintiff's exercise of religion[,] and the state bears the burden of persuasion on all other elements."); <u>see also</u> <u>Hamilton v. Smith</u>, 9:06-CV-0805(GTSDRH), 2009 WL 3199520, at *7 (N.D.N.Y. Sept. 30, 2009).

## C. Retaliation

As his Third Claim for relief, Holland asserts that Defendants retaliated against him for exercising his right to freely exercise his religion. Claims of retaliation find their roots in the First Amendment. <u>See</u> <u>Gill v. Pidlypchak</u>, 389 F.3d 379, 380-81 (2d Cir. 2004). Because of the relative ease with which allegations of retaliation can be fabricated, however, courts have scrutinized such claims with particular care. <u>Flaherty v. Coughlin</u>, 713 F.2d 10, 13 (2d Cir. 1983); <u>see also</u> <u>Dawes v. Walker</u>, 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), <u>overruled on other grounds</u>, <u>Swierkewicz v. Sorema N.A.</u>, 534 U.S. 506 (2002). To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by

the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Gill, 389 F.3d at 380 (citing Dawes v. Walker, 239 F.3d at 492).

Plaintiff's allegations of purportedly retaliatory treatment simply attempt to re-cloak his Free Exercise, RLUIPA, and due process claims. Beyond conclusory assertions of retaliatory animus, Plaintiff has offered nothing to demonstrate that Defendants acted with discriminatory intent. The Court finds that Plaintiff has failed to raise a material issue of fact as to whether there was a causal connection between the protected speech and the adverse action. The record permits but one conclusion–that a misbehavior report was generated against Holland not because he was fasting but because he could not produce a urine sample within the three hours required by Directive #4937, and there was no exception in the directive covering this situation. Defendants therefore are entitled to summary judgment dismissing the Third Claim of the Second Amended Complaint.

## IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted, and the Second Amended Complaint is dismissed. Plaintiff's Cross-Motion for Summary Judgment is denied. The Clerk of the Court is requested to close this case.

**IT IS SO ORDERED**.

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     Rochester, New York
           June 19, 2013